## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**DANIEL ANDRES,**                                    Case No. 3:16 CV 991

    Plaintiff,                                    Judge Jack Zouhary

    v.                                            Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                    REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff Daniel Andres ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated April 26, 2016). For the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed for SSI and DIB in February 2013, alleging a disability onset date of January 28, 2012. (Tr. 67). His claims were denied initially and upon reconsideration. (Tr. 140-55, 157-68). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 169). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on December 11, 2014. (Tr. 35-81). On January 27, 2015, the ALJ found Plaintiff not disabled in a written decision. (Tr. 11-29). The Appeals Council declined to review, making the hearing

decision the final decision of the Commissioner. (Tr. 1-5); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff filed the instant action on April 25, 2016. (Doc. 1).

## FACTUAL BACKGROUND

### *Personal Background and Testimony*

Plaintiff was 36 years old at the time of his application and 39 years old at the time of his hearing. (Tr. 39). He had a GED. (Tr. 40-41). Plaintiff testified to past work experience including as a forklift driver, packing boxes of pizzas, a material handler, and a job setter. (Tr. 42-45).

Plaintiff lived with his mother and his ten-year-old daughter. *Id.* Plaintiff had a driver's license and would drive to the store or take his daughter to dance class. (Tr. 41). His mother drove him to the hearing. *Id.* Plaintiff could shower independently. (Tr. 55). His daughter sometimes helped with socks and tying his boots. *Id.* He was able to do some housework (like "pick up the clothes off the floor, you know, for just, you know, a quick minute"), but couldn't "stand at the sink and wash dishes" or vacuum. (Tr. 56). His daughter helped with simple chores and his mother did the laundry and cooking. (Tr. 55). Plaintiff did some grocery shopping ("[s]ome days, depending, I may waddle into the store"), but mostly his mother shopped. (Tr. 57). He occasionally went out to eat, and watched his daughter's dance recital. *Id.*

Plaintiff testified he was unable to work due to his back issues, which began in 2004. (Tr. 45-46). He was unable to get out of bed one or two days per week. (Tr. 46). Plaintiff's lower back pain was constant but did not radiate to his legs ("not a whole lot, no, it's all in my lower back"). (Tr. 47). The pain was made worse by standing and sitting. *Id.* Plaintiff estimated he could walk one or two city blocks and then would have to sit down due to his back pain. *Id.*; Tr. 64 ("it hurts to stand upright, like I've got to fold myself in half to get relief."). Lying down helped. (Tr. 48). He estimated he could sit in one position for five to ten minutes, longer if he could shift position,

2

"but . . . it hurts, though". (Tr. 58). He estimated some days there was nothing he could lift and carry, and some days "maybe a two-liter if I'm lucky . . . but that's going to hurt, too." *Id.* Sitting for the hearing caused Plaintiff's lower back pain to be an 8 or 8.5 out of 10. (Tr. 65).

Plaintiff had two surgeries in 2012 on his cervical spine. (Tr. 48). The second surgery was performed to replace hardware from the first. *Id.* He had "slight improvement" in his neck pain from the surgeries, with less numbness in his hands. (Tr. 49). Plaintiff could rotate his neck almost normally, depending on stiffness, with pain at the extremes of motion. (Tr. 49-50). Plaintiff also had headaches two to three times per week for a few hours at a time, which he believed to be related to his neck pain. (Tr. 53). His neck pain was worse after standing or showering. (Tr. 63-64). Plaintiff's neck hurt to look up at the ceiling, but looking down relieved the pain. (Tr. 66-67). After reading or looking at a computer for five to ten minutes, his neck got tired. (Tr. 67).

Plaintiff injured his left shoulder in a fall less than a month before the hearing and was planning to have surgery. (Tr. 50-51). He testified he was unable to lift his arm above his head. (Tr. 51). He had no problems using his hands except when he gets "the tingling [and] numbness". (Tr. 52). Plaintiff testified his hands go numb once or twice per day after sitting still. (Tr. 63).

Pain medication helped his symptoms, and muscle relaxers sometimes helped "and sometimes they make it worse." (Tr. 52).

Plaintiff also testified to having depression, racing thoughts, anxiety, and difficulty sleeping. (Tr. 54). He is able to follow storylines on television, though he sometimes gets "sidetracked" by anxiety or racing thoughts. (Tr. 62).

When questioned about whether his first neck surgery failed due to Plaintiff's non-compliance with a neck collar, Plaintiff responded: "I don't know why – and I took it off when they told me to, when I - - and they told me I could take it off when I slept at night. They told me

3

that, so –". (Tr. 61). Plaintiff also testified he stopped physical therapy due to back spasms and returned to his doctor instead. *Id.*

### Relevant Medical Evidence

#### Prior to Alleged Onset Date

*Physical Health*

Plaintiff had a history of shoulder and back pain pre-dating his alleged onset date. Imaging in 2004 showed a "[m]ild amount of legal convex lumbar scoliosis" and a "mild straightening of the normal lordotic curve of the back" with "[m]ild anterior wedging of the T11 vertebral body", (Tr. 1014) and "disc protrusion at the L3-L4 and L5-S1 level", and "mild degree of spinal stenosis at the L4-L5 level" (Tr. 869). Plaintiff underwent physical therapy and had three epidural steroid injections. (Tr. 982-91, 866-68).

In 2006 and 2007, Plaintiff reported shoulder pain, and was sent to physical therapy. *See* Tr. 930-31, 1031-32. The physical therapist found "very mild" symptoms consistent with bilateral shoulder impingement. (Tr. 931).

Imaging of Plaintiff's back in 2007 showed disk degeneration at L4-L5, "moderately severe focal spinal stenosis" at L4-L5 and "posterior central subligamentous disk protrusion causing indentation on thecal sac without significant spinal stenosis or neural foraminal stenosis" at L3-L4. (Tr. 960). In November 2007, Ashok Biyani, M.D., assessed Plaintiff with degenerative disc disease at L4-L5, high intensity zone at L3-L4, and lumbar stenosis at L4-L5. (Tr. 945-46). He suggested "conservative care" with epidural injections and additional physical therapy. (Tr. 946); *see also* Tr. 965-72 (physical therapy records).

In May 2008, Plaintiff saw his treating physician Robert Kanney, M.D., for a "recheck of back pain." (Tr. 1026). Dr. Kanney referred Plaintiff back to Dr. Biyani. *Id.* In August 2008, Plaintiff discussed surgery with Dr. Biyani, but decided to "try injections." (Tr. 1025).

In January 2010, Dr. Kanney noted Plaintiff did not have much pain, and had been helped by physical therapy. (Tr. 1024). At a September 2010 emergency room visit for back pain, doctors diagnosed Plaintiff with a lumbosacral strain. (Tr. 901-02).

In 2011, Plaintiff had treatment for shoulder pain. (Tr. 309-26, 650-51). An x-ray showed no fracture or dislocation (Tr. 313), but degenerative changes in the acromioclavicular joint (Tr. 319).

*Mental Health*

Plaintiff also had some history of depression and anxiety noted by his primary care physician Dr. Kanney. *See, e.g.,* Tr. 644-45 (October 2011 diagnosis of anxiety disorder not otherwise specified); 1035 (March 2006 visit describing depression and anxiety due to marital difficulties, and noting Plaintiff was seeing a counselor); *see also* Tr. 1036 (March 2006 progress note from Glen Seaman, M.D. at Midwest Community Health Associates describing Plaintiff feeling like he is having a nervous breakdown due to fear of his wife leaving him).

**Subsequent to Alleged Onset Date**

*Physical Health*

In February 2012, Plaintiff reported to Dr. Kanney with lower back pain. (Tr. 640). Plaintiff had tenderness on palpation to his lower back and sacroiliac joint. (Tr. 641). There was no leg or foot weakness or tingling and no shoulder joint pain. (Tr. 640). Deep tendon reflexes were normal, but gait and stance were abnormal. *Id.* Dr. Kanney assessed lumbar disc degeneration, lumbar radiculopathy, and scheduled Plaintiff for a lumbar spine MRI. *Id.* He also recommended

"[r]educed physical activity", nonsteroidal anti-inflammatory medication, and muscle relaxants. *Id.* The MRI showed "mild degenerative disc disease with minimal bulging circumferentially" with "[n]o focal disc protrusions" at L3-L4; "moderate degenerative disease, as well as broad based posterior central disc protrusion, which was present previously" at L4-L5, and "disc degeneration with no other significant abnormality" at L5-S1. (Tr. 637).

At Plaintiff's next visit, his pain was "a little better but still miserable." (Tr. 635). Plaintiff had tenderness to the thoracolumbar spine and sacroiliac joint on palpation and muscle spasms in the lumbosacral spine. (Tr. 636). Spine range of motion was abnormal, but Plaintiff's gait, stance, and deep tendon reflexes were normal. *Id.* Dr. Kanney referred Plaintiff to neurosurgery. *Id.*

Plaintiff had a physical therapy evaluation in March 2012. (Tr. 630-32). Plaintiff had no significant gait deviation, decreased lumbar lordosis, and "some mild tenderness left low back/S1 region with some muscular tightness throughout the lumbar paraspinals." (Tr. 631). His toe and heel walking, deep tendon reflexes and lower extremity strength were normal. *Id.* Notes indicated increased pain when sitting or standing, and decreased pain when laying down. (Tr. 621). After several sessions, Plaintiff reported his lower back pain was "less intense" and the physical therapist noted improvement. *Id.* (March 19, 2012). Later that month, Plaintiff reported 30 percent improvement. (Tr. 620) (March 23, 2012). At the final appointment he attended, Plaintiff stated he slept wrong and his lower back was very sore. *Id.* Physical therapy notes thereafter document repeated no-shows, followed by a note of "no further contact" in June 2012. *Id.*

On March 29, 2012, Plaintiff saw neurosurgeon A. Medhkour, M.D. (Tr. 442-49). Plaintiff reported sharp shooting lower back pain radiating to his left hip and sharp shooting neck pain radiating down his left arm and causes numbness and weakness. (Tr. 443). Plaintiff had tenderness and abnormal range of motion in his neck. (Tr. 447). Muscle tone bulk and strength, as well as

posture, gait, and balance were normal. *Id.* Dr. Medhkour directed Plaintiff to continue physical therapy "[d]ue to normal motor and sensory exam and pt's age", and to see pain management for a trial of "pain injections." (Tr. 448). Dr. Medhkour also ordered a cervical spine MRI. *Id.*

Plaintiff returned to Dr. Medhkour on May 4, 2012. (Tr. 435). Dr. Medhkour observed pain and stiffness in Plaintiff's neck and back, as well as joint swelling, pain, and limitation of movement. (Tr. 437). Plaintiff had normal muscle tone, bulk, and strength; his gait was normal. (Tr. 439). An MRI showed "[c]ervical stenosis from C5-C6 and C6-C7 complicated by edema of the spinal cord at C6-C7". (Tr. 440); *see also* Tr. 806-07. Dr. Medhkour "recommended [Plaintiff] to be on soft-medium cervical collar to stabilize his cervical spine" pre-surgery. (Tr. 440).

Plaintiff also saw Joseph Atallah, M.D., on May 4, 2012. (Tr. 610). Plaintiff had a "straight gait" and was able to do heel and toe walking "without any problems." *Id.* He had no tenderness over the lumbar facet or SI joint. *Id.* His straight leg raising test was positive bilaterally. *Id.* Dr. Atallah assessed lumbar radiculopathy and herniated disk and scheduled three transforaminal epidural steroid injections. *Id.*

Radiological imaging pre-surgery in May 2012 found satisfactory frontal alignment, normal lordosis, and degenerative spondylosis at C5-C6 and "to a greater degree" C6-C7 with posterior spurs. (Tr. 1111-12). Plaintiff underwent surgery on May 18, 2012 due to "myelopathy symptoms due to cord compression and nerve root compression bilaterally." (Tr. 1124). His discharge summary indicated the surgery included "anterior cervical decompression at C5-C6 and C6-C7 with bilateral foraminotomy and osteophytectomy" and "[a]rthrodesis was performed at these levels." (Tr. 490). He was instructed to wear a collar at all times for neck stability and "no lifting of weight or driving until followup [sic] in the Neurosurgery Clinic." *Id.*

On May 24, 2012, Plaintiff returned to Dr. Medhkour reporting continued pain. (Tr. 428-33). Dr. Medhkour noted Plaintiff's neck range of motion was abnormal. (Tr. 431). But, Plaintiff's posture, gait, ability to climb on the exam table, and ability to change positions smoothly was normal. *Id.* Dr. Medhkour also noted normal bulk, tone, and strength in Plaintiff's upper and lower extremities, as well as a normal gait. (Tr. 432). Dr. Medhkour assessed chronic back and neck pain, cervical spinal stenosis, and ordered a lumbar spine MRI. (Tr. 433).

Later that month, Plaintiff saw Dr. Kanney. Plaintiff's neck was "better but back worse". (Tr. 595). Dr. Kanney found Plaintiff's thoracolumbar spine tender to palpation and motion was abnormal. (Tr. 596). He also found muscle spasms and abnormal motion in Plaintiff's lumbosacral spine. *Id.* Plaintiff had tenderness on palpation of the sacroiliac joint and his gait and stance were abnormal. *Id.* Dr. Kanney prescribed pain medication, advised Plaintiff that "[r]educed physical activity [was] recommended", and noted: "[p]hysical activity restrictions – lifting". *Id.*

Plaintiff again saw Dr. Medhkour on June 5, 2012 for sharp neck and shoulder pain. (Tr. 586). Dr. Medhkour found neck and back stiffness and pain as well as limitation of joint movement. (Tr. 587). X-rays taken to check healing showed "no evidence of hardware complication", "straightening of the normal cervical lordosis" and "mild bony spurring". (Tr. 780). The x-rays showed "good placement of screws and fusion is holding nicely." (Tr. 588). Dr. Medhkour instructed Plaintiff to remove the collar at night and begin physical therapy. (Tr. 589).

On June 29, 2012, Plaintiff went to the emergency room for neck and shoulder pain. (Tr. 335-50). On examination, his neck had a "well healed anterior wound with some tenderness noted to the left sternocleidomastoid muscle and posterior spinous process." (Tr. 339). Emergency room doctors diagnosed "cervical radiculopathy status post surgery with post surgical pain", instructed him to follow up with his physician, and prescribed pain medication. (Tr. 340).

On July 20, 2012, Plaintiff returned to Dr. Medhkour. (Tr. 416-22). He reported his emergency room visit and that he still had pain "but it is not as bad". (Tr. 417). Notes indicate Plaintiff wore the collar "but go[t] to where he did not want to wear it anymore and decided not to wear it." (Tr. 418). Dr. Medhkour found neck tenderness and abnormal range of neck motion. (Tr. 420). Plaintiff's muscle strength, tone, and bulk were normal, as was his gait (though Plaintiff stated his balance was "off"). (Tr. 421, 419). Thoracic and lumbar spine range of motion were normal with no tenderness. (Tr. 420). X-ray showed "hardware complications with loosening at C5 and moderate displacement of bone graft but plate still in position." (Tr. 421). Dr. Medhkour planned revision surgery and noted Plaintiff "instructed to wear Miami j collar for 1 month after revision to ensure holding." (Tr. 422).

In July 2012, Dr. Kanney found Plaintiff's neck swollen and tender, with cervical spine flexion and extension abnormal, but no cervical spine muscle atrophy. (Tr. 576). He assessed localized osteoarthritis of the neck, cervical disc degeneration, headache symptoms, depression, and anxiety disorder NOS. *Id.* In August, Dr. Kanney noted Plaintiff was "in a lot of pain and taking significant amounts of [pain medication]" and "[a]t this point is totally unable to work and I do not expect [him] to be able to physically return to the heavy labor he had been doing." (Tr. 572). He had tenderness in his lower back and muscle spasms in his lumbosacral spine. (Tr. 573).

Plaintiff underwent the revision surgery with Dr. Medhkour on September 13, 2012. (Tr. 477-78). A halo was placed after the surgery due to "questionable compliance with immobilization by a Miami J collar." (Tr. 479). Discharge summary notes state Plaintiff "experienced hardware failure due to his noncompliance with Miami J collar." (Tr. 450). Upon discharge, Plaintiff was instructed to not lift or drive, but that he could weight bear "as tolerated" and to follow up with

Dr. Medhkour in 1-2 weeks. (Tr. 451). A radiological report on September 27 showed "unchanged C-spine alignment with anterior cervical fusion of C4 through C7." (Tr. 379).

In October 2012, Plaintiff fell wearing his halo and went to the emergency room. (Tr. 352-63). Notes indicate Plaintiff "ambulate[d] with unrestricted gait and without obvious difficulty." (Tr. 357). X-rays showed no acute abnormalities and Plaintiff was instructed to contact his neurosurgeon. (Tr. 358).

Plaintiff returned to Dr. Medhkour on November 1, 2012 reporting loose screws in his halo. (Tr. 395). Plaintiff "appear[ed] uncomfortable". (Tr. 397). His posture and gait were abnormal, and he had neck tenderness and abnormal range of motion. *Id*. Plaintiff also had abnormal range of motion, strength and tone, as well as tenderness in his lumbar spine and shoulder. *Id.* Plaintiff opted to remove the halo and Dr. Medhkour advised Plaintiff to "wear the hard collar for 5 weeks, full-time wearing, and no driving." (Tr. 399). Dr. Medhkour noted that "[l]umbar surgery [would] be discuss[ed] in 6 months, since patient is still having lower back pain." *Id.* At a November 29, 2012 visit, Dr. Medhkour stated Plaintiff's "healing process [was] doing well" and "[t]he rods and screws are in good positions." (Tr. 392). Plaintiff was instructed to wear the collar for 4 weeks, but could remove it to shower. *Id.* He was also instructed "not to perform any contact sports and any activities that use[] the neck muscles due to spinal instability." *Id.* X-rays taken the same day showed removal of the halo, but otherwise no change and no hardware loosening. (Tr. 376).

Plaintiff returned to Dr. Kanney in early 2013. *See* Tr. 544-45. He reported continued neck pain despite the surgery and that he had not worn the neck collar for the two weeks prior. (Tr. 544). Plaintiff's neck was swollen and his cervical spine was tender to palpation. (Tr. 545). Dr. Kanney planned to continue pain management. *Id.*

10

In February 2013, Plaintiff returned to Dr. Medhkour. (Tr. 383-87). Dr. Medhkour noted abnormal gait and posture, as well as abnormal range of motion in lumbar spine and neck. (Tr. 387). Plaintiff also had tenderness in his neck and lumbar spine. *Id.* Dr. Medhkour assessed lumbar disc degeneration and ordered a lumbar spine MRI and an occupational therapist functional capacity evaluation. (Tr. 388).

On March 29, 2013, Plaintiff underwent a physical work performance test by Lynne Chapman, MS, OTR/L. (Tr. 863-65). Ms. Chapman stated that based on her assessment, Plaintiff was capable of "work at the light level" and that he was capable of sustaining such work throughout an 8-hour day. (Tr. 864). Ms. Chapman concluded Plaintiff could, among other things: frequently sit, occasionally stand, occasionally lift 10-30 pounds, push or pull 90 pounds, occasionally work kneeling or bent over (sitting), and never work bent over (standing/stooping) or squatting/crouching. (Tr. 863-64). Ms. Chapman concluded Plaintiff was limited by pain in his cervical and lumbar spine and numbness and tingling in both hands. (Tr. 865). Her recommendation was that Plaintiff complete his physical therapy and then "contact his local office of the Bureau of Vocational Rehabilitation . . . [for] assist[ance] . . . with finding work that falls within the category of light duty with the restrictions per this report." *Id.*

Plaintiff again saw Dr. Kanney in May 2013 to address neck pain radiating to the shoulder, back pain, and arm and hand weakness. (Tr. 532). Plaintiff's neck was tender to palpation and pain was elicited with motion. (Tr. 533). Flexion and extension were abnormal. *Id.*

Plaintiff saw Dr. Medhkour in June 2013 for continued neck pain with hand and arm numbness. (Tr. 853-58). Dr. Medhkour noted abnormal posture and gait, as well as tenderness and an abnormal range of motion in Plaintiff's neck and lumbar spine. (Tr. 856-57). Muscle strength and tone were abnormal. (Tr. 856). Plaintiff had increased lumbar lordosis, tenderness in several

11

locations, and abnormal flexion, extension, and rotation. (Tr. 857). An x-ray of Plaintiff's cervical spine showed no hardware complications and no change in alignment. (Tr. 857, 861). Plaintiff again saw Dr. Medhkour in December 2013 for neck and back pain. (Tr. 844-52).

In February 2014, Plaintiff saw Dr. Kanney and reported his neck pain had been "a little better." (Tr. 826). He wanted to "wean off the methadone" and manage his pain without it. *Id.* Plaintiff's cervical spine was tender to palpation and motion was abnormal. (Tr. 827).

Plaintiff returned to Dr. Medhkour in March 2014 for lower back pain. (Tr. 840). Dr. Medhkour assessed cervical spinal stenosis, and uncontrolled disc degeneration both cervical and lumbar. (Tr. 842). Back examination notes from April 2014 indicate no increased lumbar lordosis, no paraspinal muscle tenderness or muscle tightness. (Tr. 837-38). Thoracolumbar flexion and lumbosacral extension were abnormal, but rotation and lateral bending were normal and not painful. (Tr. 838). Straight leg raising was normal on both sides. *Id.* An MRI indicated L3-L4 neural foraminal narrowing on the left and L4-L5 disc bulge and right neural foraminal narrowing. *Id.* Dr. Medhkour instructed Plaintiff to stop smoking, lose weight, return to pain management for epidural steroid injections of his lumbar spine, and referred him to physical therapy. (Tr. 839).

Plaintiff returned to pain management in May 2014. (Tr. 829-33). His gait was normal, but he had lumbar spine tenderness and abnormal range of motion. (Tr. 832). His thoracolumbar flexion and lumbosacral extension were abnormal. *Id.* Plaintiff also had a positive facet loading test bilaterally. *Id.* He had a normal gait and no decreased muscle tone or muscle weakness. *Id.* Dr. Atallah performed a medial branch block. *Id.*

Plaintiff also began physical therapy in May 2014. (Tr. 821). Plaintiff ambulated without assistance, but his gait was "[s]omewhat guarded". *Id.* He could toe and heel walk and his deep tendon reflexes were intact. *Id.* His trunk range of motion was limited in both flexion and extension

12

and he had tenderness to palpation in his paraspinal muscles at the thoraco-lumbar junction. *Id.* The physical therapy plan was therapy twice per week for six weeks "as able." *Id.*

Plaintiff returned for his second physical therapy visit on June 24, 2014. (Tr. 820). His back was "so-so" and he had minimal discomfort with therapy exercises. *Id.* Two days later, Plaintiff attended another physical therapy session at which he was "[c]ooperative despite pain." (Tr. 819). He reported he was planning to request a TENS unit from his physician. *Id.* At a July 1, 2014 visit, Plaintiff's back wasn't "too bad", but the physical therapist assessed "[l]ittle change in function or pain." (Tr. 818). On July 8, Plaintiff's physical therapist showed him how to use a TENS unit. (Tr. 814). The therapist made a note to "[c]onsider aquatics next visit." *Id.* Plaintiff failed to return for any physical therapy sessions and was therefore discharged. (Tr. 813).

In September 2014, Plaintiff saw Dr. Kanney again after falling. (Tr. 1209-11). Dr. Kanney found tenderness in the anterior portion of the left shoulder, stiffness and decreased range of motion in the neck, and tenderness on palpation of low back. (Tr. 1209). Dr. Kanney ordered an MRI of Plaintiff's shoulder. *Id.*

Plaintiff saw Dr. Medhkour in October 2014 for follow up of back and neck pain, and also reported left shoulder pain after a fall. (Tr. 1189). Plaintiff's left upper extremity was "held adducted and internally rotated" and there was "limited abduction of the left [upper extremity]." (Tr. 1190). Dr. Medhkour ordered cervical spine x-rays, Tr. 1190, which showed "[s]tatus post fusion C4-C7 with some reversal of lordosis and posterior element degenerative changes" and "[n]o interval change when compared to previous examination." (Tr. 1192-93).

That same month, Abdulazim Mustapha, M.D., in the Orthopedic Clinic, found neck and back stiffness and pain, as well as anterior and lateral shoulder tenderness. (Tr. 1181-82). Notes indicate an MRI scan found "[f]ull thickness retracted supraspinatus/infraspinatus tears with cyst

13

in greater tuberosity; large joint effusion and fluid in subacromial 7 subdeltoid bursae." (Tr. 1182). Dr. Mustapha assessed rotator cuff tear and indicated Plaintiff would require surgical intervention "but likely require extensive arthoscopic expertise" and referred him to another physician. *Id.*

Plaintiff saw Patrick N. Siparsky, M.D., in the Orthopedic Clinic in November 2014. (Tr. 1176-79). Plaintiff reported weakness, but his pain and range of motion had "improved somewhat since the initial accident." (Tr. 1176). Dr. Siparsky found abnormal shoulder range of motion. (Tr. 1178). He ordered physical therapy and planned a left shoulder arthroscopy. (Tr. 1179).

Plaintiff returned to Dr. Kanney in December 2014 for pain management. (Tr. 1207). He reported having upcoming left shoulder surgery and injections into his lower back. *Id.* Dr. Kanney noted tenderness over the left shoulder and "[a] lot of low back spasm." *Id.* Dr. Kanney assessed chronic neck and back pain, and left rotator cuff tear. *Id.* He planned to maintain Plaintiff's pain management and see him again in three months. *Id.*

*Mental Health*

There are also occasional notes in the record subsequent to Plaintiff's alleged onset date addressing Plaintiff's mental status or mental health. *See* Tr. 437 (Dr. Medkhour's May 2012 note that Plaintiff had difficulty sleeping, mood swings, felt anxious, and felt depressed); Tr. 431 (Dr. Medkhour's May 2012 note that Plaintiff was alert and oriented, with normal memory function, and that he had good concentration and articulated clearly); Tr. 587 (Plaintiff's June 2012 report to Dr. Medhkour of mood swings); Tr. 337, 339 (June 2012 emergency room notes that Plaintiff's mental status was intact and he was calm and cooperative); Tr. 576 (Dr. Kanney's July 2012 assessment of depression and anxiety disorder not otherwise specified); Tr. 419-20 (Dr. Medhkour's July 2013 normal mental status exam); Tr. 413 (Dr. Medhkour's "[m]ini [m]ental [s]tatus [e]xam" showing full scores in each category); Tr. 403 (Dr. Medhkour's September 2013

14

normal mental status examination; Tr. 392 & 397 (Dr. Medhkour's November 2012 mental status examinations noting that Plaintiff was alert, oriented, cooperative, with normal memory function and good concentration); Tr. 387 (Dr. Medhkour's March 2013 mental status examination notes that Plaintiff was alert, oriented, cooperative, with normal memory function and good concentration); Tr. 533 (Dr. Kanney's May 2013 notes indicated discussing depression and anxiety with Plaintiff); Tr. 826 (Dr. Kanney's February 2014 note that Plaintiff was "emotional[ly] distraught due to loss of ex-wife from medication [overdose].");  Tr. 841-42 (Dr. Medhkour's March 2014 assessment that Plaintiff was "[a]lert, [o]riented, [and] [c]ooperative").

*Consultative Examining Physician*

On April 26, 2013, consultative examiner Neil S. Shamberg, Ph.D, clinical psychologist, evaluated Plaintiff at the request of the state agency. (Tr. 524-29). Plaintiff reported taking medications for his neck and back pain, as well as "Ativan, on a prn basis for anxiety and depression." (Tr. 525). On observation, Dr. Shamberg noted Plaintiff "seemed somewhat nervous, somewhat suspicious, and very flat and depressed" but also "polite, deferential, and cooperative, in a manner appropriate for the office setting." (Tr. 526). His thought process was "logical, coherent, and goal directed." *Id.* Plaintiff reported a fear of people, but did not "[m]anifest signs of anxiety such as crying, fidgeting, and/or trembling". (Tr. 527). Plaintiff "slowly but correctly completed the Serial 3" task, as well as the Serial 7 task (though he made two errors in the latter). *Id.* Dr. Shamberg assessed Plaintiff's intellectual functioning as average. *Id.*

Dr. Shamberg assessed a GAF score of 45.[1] He concluded Plaintiff would have "some problems remembering job instructions, and carrying them out." (Tr. 529). He also noted "[n]ot

---

1. The GAF scale represented a "clinician's judgment" of an individual's symptom severity or level of functioning. Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders,* 32–33 (4th ed., Text Rev.2000). "The most recent (5th) edition of the Diagnostic and Statistical

too many limitations were noted . . . with regard to his ability to understand simple job instructions" though Plaintiff was "in the grip of a current major depressive episode." *Id.* Dr. Shamberg observed "some slight limitations" in Plaintiff's "ability to attend and to concentrate, due to anxiety, some pain, and some depression." *Id.* With regard to attention, concentration, and maintaining persistence and pace, Dr. Shamberg noted that "on a job he would have problems, if his depression continues, keeping up the pace and problems with job and task persistence." *Id.* Due to Plaintiff's "[s]ocial [p]hobia", Dr. Shamberg concluded Plaintiff "would have problems responding appropriately to most supervisors and many coworkers in all work settings." *Id.*

*State Agency Reviewing Physicians*

On March 29, 2013, state agency reviewing physician Louis Goorey, M.D., reviewed Plaintiff's records. (Tr. 87-89). Dr. Goorey concluded Plaintiff could: occasionally lift twenty pounds, frequently lift ten pounds, stand or walk a total of four hours in an eight-hour workday, and sit about six hours in an eight-hour workday. (Tr. 87). He concluded Plaintiff had an unlimited capacity to push/pull "other than shown, for lift and/or carry". *Id.* Plaintiff could climb ramps and stairs, but could never climb ladders, ropes or scaffolds, and was limited to occasionally stooping, kneeling, crouching, or crawling. (Tr. 88). Dr. Goorey found Plaintiff's bilateral overhead reaching was limited to frequent due to his cervical stenosis, status post fusion. *Id.* He thought Plaintiff

Manual of Mental Disorders does not include the GAF scale." *Judy v. Colvin,* 2014 WL 1599562, at *11 (S.D. Ohio); *see also* Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("DSM—V") (noting recommendations "that the GAF be dropped from [DSM–V] for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice"). However, as set forth in the DSM—IV, a GAF score of 41-50 indicated "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

should avoid all exposure to hazards due to degenerative disc disease. (Tr. 89). On July 24, 2013, Gerald Klyop, M.D., reached the same conclusions. (Tr. 114-17).

On May 3, 2013, state agency reviewing psychologist Carl Tishler, Ph.D., reviewed Plaintiff's records and concluded Plaintiff had mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (Tr. 86). On August 1, 2013, state agency psychologist Kristen Haskins, Psy.D., reached the same conclusions, except she identified moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 112-13). Both psychologists noted they gave great weight to Dr. Shamberg's report as it was consistent with the record. (Tr. 87, 114).

### VE Testimony and ALJ Decision

At the hearing, the ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and past work experience who: 1) was limited to light exertional work; 2) could only stand and walk for four hours in an eight-hour workday; 3) could occasionally stoop, crouch and crawl; 4) could never climb ladders ropes, or scaffolds and must avoid workplace hazards such as unprotected heights and dangerous, moving machinery; 5) was limited to only occasional overhead reaching with the left upper extremity; and 6) was limited to understanding remembering and carrying out simple, routine and repetitive tasks. (Tr. 70-71). The ALJ added: "The pace of productivity should not be dictated by an external source over which the individual has no control such as an assembly line or conveyor belt. The individual may have no interactions with the public and only occasional superficial interactions with co-workers and supervisors." (Tr. 71).

The VE testified that such an individual would not be able to perform his past work. (Tr. 71). Such an individual could, however, perform the jobs of inspector, packager, and assembler, which are all at the light exertional level. (Tr. 71-72).

17

The ALJ then added restrictions of: 1) no "twisting or turning of the head to the ends of range of motion, but the individual can turn his body to accommodate"; and 2) "[t]here should be no vocational need for the individual to hold his head in a fixed position." (Tr. 72). The VE testified that adding such restrictions would not change his previous testimony. (Tr. 72-73).

The ALJ again changed the hypothetical to limit the individual to sedentary work. (Tr. 73). The VE testified such an individual could perform the job of assembler, or handwork jobs such as polisher, smoother, or trimmer. *Id.* Finally, the ALJ modified the hypothetical to include a restriction to sedentary work with: 1) occasional kneeling and crawling; 2) occasional stooping from a seated position, no stooping from a standing position; 3) no repetitive trunk rotation from a seated position, but occasional trunk rotation from a standing position; 4) no crouching or squatting; 5) no climbing ladders, ropes, or scaffolds, and avoid hazards such as unprotected heights and dangerous, moving machinery; 6) occasional overhead reaching with the left upper extremity; and 7) the same mental restrictions as before (simple, routine, repetitive tasks, pace/productivity limitations, and limitations in interacting with others). (Tr. 73-74). The VE testified that such an individual could perform the same jobs described in the previous hypothetical. (Tr. 74). However, if the person were off task twenty percent of the day, or would miss four days of work per month, work would not be available. *Id.*

In her written decision, the ALJ concluded Plaintiff retained the RFC for light work:

> except he could only stand and walk for a total of four hours of an eight-hour workday. [He] may occasionally stoop, crouch and crawl. He may never climb ladders, ropes or scaffolds and must avoid workplace hazards such as unprotected heights and dangerous, moving machinery. [He] can perform only occasional overhead reaching with the left upper extremity. [He] is limited to understanding, remembering and carrying out simple, routine and repetitive tasks. The pace of productivity should not be dictated by an external source over which [he] has no control such as an assembly line or conveyor belt. [He] may have no interaction with the general public and only occasional, superficial interaction with co-workers and supervisors. [He] is precluded from twisting or turning of the head to the ends

18

of range of motion but [he] can turn his body to accommodate. There should be no vocational need for [him] to hold his head in a fixed position.

(Tr. 17).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner

follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

4. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff alleges the ALJ erred in four ways: 1) in not granting controlling weight to treating physician Dr. Kanney's opinion; 2) in failing to consider the record as whole; 3) not properly addressing the listings; and 4) by negating psychological consultative examiner Dr. Shamberg's opinion without providing good reasons. The Commissioner responds that none of this is error, and the ALJ's decision is supported by substantial evidence.

***Treating Physician Opinion***

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"[M]edical opinions" are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite your impairment(s), and your physical or mental restrictions." 20 C.F.R. § 494.1527(a)(2); *cf. Dunlap v. Comm'r of Soc. Sec.*, 509 F. App'x 472, 476 (6th Cir. 2012) (statements made by treating physician did not constitute an "opinion" as defined in 20 C.F.R. § 404. 1527(a)(2))).

A treating physician's opinion is given "controlling weight" if it (1) is supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons"

are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011). ALJ may also give "good reasons" by challenging the supportability and consistency of the treating physician's opinion in an "indirect but clear way", *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010), or "implicitly provid[ing] sufficient reasons for not giving those opinions controlling weight, and indeed for giving them little to no weight overall", *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 472 (6th Cir. 2006).

Plaintiff argues the ALJ failed to consider Dr. Kanney's "nuanced opinions" and "zoom[ed] in on the narrow assertion Dr. Kanney made as to [Plaintiff's] outlook at a single point in 2013 that [Plaintiff] could not then return to his prior work." (Doc. 16, at 19); *see also* Doc. 16, at 18) ("In the course of his record, Robert Kanney, M.D., communicates the opinion that [Plaintiff] still has periodic issues in both shoulders; neck, low back, and mid-back issues with demonstrated radiating effects during flare ups; and other impairments in combination limiting him."). The regulations define "medical opinions" as "statements . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis,

22

what you can still do despite your impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Dr. Kanney's statement on August 20, 2012 that Plaintiff "[a]t this point is totally unable to work and I do not expect [him] to be able to physically return to the heavy labor he had been doing" is the only *opinion* evidence Dr. Kanney provides. (Tr. 572). The remainder of the records Plaintiff cites are simply treatment notes. *See Dunlap,* 509 F. App'x at 476; *Bulick v. Colvin*, 2014 WL 2003049, at *1 (N.D. Ohio) ("Although it appears that Dr. Dang diagnosed plaintiff with depression and anxiety, there is no statement of 'nature and severity' of the symptoms or impairments, the prognosis, or any restriction Dr. Dang believes the depression or anxiety would cause plaintiff in a work setting. Therefore, the notes do not constitute 'opinion' evidence."); *Messina v. Comm'r of Soc. Sec.*, 2013 WL 1196597, at *1 (S.D. Ohio) (records containing only treatment notes are not "medical opinions" and, therefore, the treating source rule does not apply). Although these treatment notes describe ongoing problems, Dr. Kanney does not explain the functional effects of those problems. Because it was not error for the ALJ to focus on this statement made by Dr. Kanney, the undersigned turns to whether the ALJ provided the necessary analysis of this treating physician opinion. As discussed below, the undersigned finds no error.

First, the ALJ's determination is, in part, consistent with Dr. Kanney's conclusion. Dr. Kanney opined that Plaintiff would not be able to return to his previous job requiring heavy labor. (Tr. 572). The ALJ ultimately limited Plaintiff to a reduced range of sedentary work and recognized that Plaintiff would not be able to return to his prior work. *See* Tr. 17 (setting forth RFC); Tr. 21 ("an opinion that the claimant is unable to return to his prior heavy labor position is not inconsistent with the findings as discussed later herein . . . "). *See Johnson-Hunt v. Comm'r of Soc. Sec.,* 500 F. App'x 411, 419 (6th Cir. 2012) (harmless error in treating physician context where ALJ makes findings consistent with treating physician opinion).

Second, the issue of whether a claimant is ultimately disabled is an issue reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled . . . ."); *Bass v. McMahon*, 499 F. 3d 506, 511 (6th Cir. 2007). The ALJ was correct in identifying this rule, Tr. 21, and was not required to defer to Dr. Kanney's opinion that Plaintiff was "totally unable to work", Tr. 572. *See* 20 C.F.R. § 404.1527(d)(3) (no "special significance" given to opinions about disability, even those by treating physician); *Brock*, 368 F. App'x at 625.

Third, the ALJ provided the required "good reasons" for discounting Dr. Kanney's opinion by explaining that his "preclusion of all work [did] not appear consistent with the clinical or diagnostic findings in the record, rendering it unpersuasive." (Tr. 21). Specifically, the ALJ pointed to the fact that "neuro[lo]gical examinations displayed the claimant had normal bulk and tone along with normal sensation and full strength in the bilateral upper and lower extremities in spite of his complaint of severe back and neck pain at post-revision surgical visits beginning in November 2012." (Tr. 21) (citing Tr. 388, 392, 398, 540, 663, 670, 674, 838, 848, 851, 857, 1186-87) (records from November 2012 through October 2014 indicating normal muscle bulk, tone, strength, and sensation in his upper and lower extremities). The ALJ explained that "[p]ain management records also revealed although the claimant had diminished range of motion in the lumbar spine, paraspinal muscle tenderness and positive facet loading, there was no radiation to his legs, his gait was normal, there was no joint laxity, muscle weakness or decreased muscle tone, his sensation to light touch was normal and he had full strength in the knee and ankle." (Tr. 21) (citing Tr. 832-33; Tr. 1172-74). The ALJ also pointed out that as recently as April 2014, Plaintiff had denied arm, hand, and leg weakness, as well as any trouble with grip strength or paresthesias. (Tr. 21) (citing Tr. 835). This summary supports the ALJ's decision to discount Dr. Kanney's

opinion that Plaintiff was precluded from all work. While the ALJ recognized that Plaintiff had some restrictions—and indeed ultimately limited him to a reduced range of sedentary work—the cited records support the ALJ's conclusion that Plaintiff was not completely unable to work.

Finally, as part of his analysis, the ALJ provided "great weight" to a portion of the opinion of occupational therapist Lynne Chapman, and the opinions of state agency reviewing physicians who each concluded Plaintiff was capable of some level of work. *See* Tr. 22-23 (citing Tr. 87-89, 114-17, 863-65); 20 C.F.R. § 1527(e)(2)(i) (state agency physicians considered experts in Social Security Disability evaluation); SSR 96-6p, 1996 WL 374180, at *2 (opinions of state agency physicians "can be given weight only insofar as they are supported by evidence in the case record"). These also lend support to the ALJ's decision to discount Dr. Kanney's opinion that Plaintiff was incapable of any work.[2] The undersigned therefore concludes that the ALJ did not err in his treatment of Dr. Kanney's opinion.

### *Temporary Restrictions / Linking Adjacent Time Periods*

Plaintiff's second argument is that the ALJ erred in discounting some restrictions as temporary or vague. Specifically, he argues the ALJ did not link together various restrictions to "see the forest through the carefully-hewed trees." (Doc. 16, at 21). Plaintiff seemingly argues now, as he did before the ALJ, that these restrictions "at the least, cover a closed period where functionality [was] severely constrained, probably both as to upper and lower body, but fairly

---

2. In his reply brief, Plaintiff seems to allege, for the first time, that the ALJ failed to "really account" for his obesity. (Doc. 19, at 2). As this argument was not raised in Plaintiff's opening brief (and is not a developed argument), it is waived. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 646, 466 (6th Cir. 2003) (issues not raised in opening brief are waived); *McPherson v. Kelsey*, 125 F.3d 989. 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citation and internal quotation omitted).

consistently as to one or the other explicitly." (Doc. 16, at 21); *see* Tr. 78-79. The Commissioner responds the ALJ reasonably discounted the various restrictions as temporary or vague. Further, the Commissioner contends, even if such restrictions were "lined up back-to-back", they do not span the 12 months necessary to meet the durational requirements of disability. (Doc. 18, at 18).

The ALJ assigned "little weight' to "the opinions from [Plaintiff's] various providers with regard to the claimant wearing a collar on his neck, lifting, driving, and contact sports" because "they appeared [to] have been temporary restrictions while he recovered from cervical surgery and revision and not intended to be representative of his baseline level of functioning." (Tr. 21). The ALJ reasoned: "the fact that the opinions were accompanied by specific timeframes, such as four weeks or until a follow-up visit, supports such an inference". *Id.* With regard to earlier references to restrictions, the ALJ explained that:

> although . . . the claimant's primary care provider recommended reduced physical activity and restrictions on lifting in February and May 2012, their recommendations are accorded little weight as well. Such weight is accorded to their pronouncements due to their vague nature, as the terms "reduced physical activity" and "lifting" lack specificity in order for the undersigned to determine the claimant's physical capabilities without more.

(Tr. 22).

Plaintiff, although objecting to the ALJ's treatment of certain restrictions as vague or temporary, does not point to record evidence demonstrating these restrictions were placed on him by a physician for more than 12 months as required to establish disability. The first reference in the record to "reduced physical activity recommended" came from Dr. Kanney on February 1, 2012. (Tr. 641). This recommendation was continued on February 10, 2012 and May 30, 2012. (Tr. 590, 596, 636). Recommendations that Plaintiff wear a cervical collar began in May 2012 and continued through his two surgeries (May 2012 and September 2012). (Tr. 440, 490). After his second surgery, Plaintiff had a halo placed from September 2012 through November 1, 2012. (Tr.

479, 399). The hard collar, worn after the removal of the halo, was removed in December 2012. *See* Tr. 544 (January 2013 treatment note that Plaintiff had been "out of halo for several weeks and no neck collar for last 2 weeks"). Although Dr. Kanney's notes indicate continued neck pain, swelling and tenderness, they do not identify any specific work related restrictions. (Tr. 545). Similarly, during the time period surrounding his surgeries, Plaintiff was given various restrictions as to driving or lifting. *See* Tr. 590 (May 2012 notation of lifting restrictions); 1102 (May 2012 post-surgery notation of "no lifting of weight or driving until followup in the Neurosurgery Clinic"); 1088 (September 2012 discharge instructions indicating no lifting or driving); 392 (November 2012 notation that Plaintiff is to "[w]ear the collar for 4 weeks, ok to take off during the shower" and to avoid contact sports). Thus, the ALJ provided a reasonable basis for discounting these restrictions—they appeared to be temporary, and not long term. *See* 20 C.F.R. § 416.905(a) (Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."). Thus, the undersigned concludes, the ALJ did not err in his treatment of these records. And it was reasonable to give little weight to non-specific statements about "reduced physical activity" and "physical activity restrictions – lifting". Although the statements suggest some limitation, they are not specific enough for the ALJ to determine how they would translate into work-related restrictions. *See, e.g., Rouse v. Comm'r of Soc. Sec.*, 2017 WL 1102684, at *4 (N.D. Ohio) (vagueness of opinion is valid reason for discounting); *Pugh v. Comm'r of Soc. Sec.*, 2015 WL 419000, at *14 (N.D. Ohio) ("In light of her qualified opinion, the ALJ's decision to discount the opinion based on its vagueness is sufficiently clear and supported by the evidence."). Moreover, these stated limitations do not necessarily imply an inability to perform any work.

Notably, the ALJ found Plaintiff limited to a reduced range of sedentary work, with specific restrictions in place to account for his neck problems. *See* Tr. 17. As such, the undersigned concludes the ALJ did not err in this regard.

### Listing 1.00 and 1.04

Plaintiff's third argument is that the ALJ failed to properly address listing 1.04A. The Commissioner responds the ALJ did not err, and even if he did, such error was not harmful.

A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that he is disabled at Step Three of the sequential evaluation process. *See* 20 C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 855 (6th Cir. 1986). The claimant has the burden to prove all the elements are satisfied. *King v. Sec'y of Health & Human Servs.,* 742 F.2d 968, 974 (6th Cir.1984). Moreover, "[t]he burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir.1986). It is not sufficient to come close to meeting the conditions of a Listing. *See, e.g., Dorton v. Heckler,* 789 F.2d 363, 367 (6th Cir.1989) (Commissioner's decision affirmed where medical evidence "almost establishes a disability" under Listing).

At Step Three of the analysis, the ALJ addressed Listing 1.04:

> In particular, while the [Plaintiff's] representative argued that the claimant meets Listing 1.04, the record does not indicate that the claimant has lost the ability to effectively ambulate to meet the criteria of the Listing, as discussed in greater detail below (Exhibit 6F/9 and 7F/4). In fact there is no evidence that the claimant is unable to ambulate without the use of a walker, two crutches or two canes, as required in the preamble of Section 1.00.

(Tr. 15).

The primary disagreement between the parties here is whether the requirements in the introduction to the relevant Listings, in Listing 1.00 (Musculoskeletal System) are a necessary

precursor to Listing 1.04A. Listing 1.00 states that "functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis" and later defines what it means to ambulate effectively. Listing 1.04A provides:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

Listing 1.04A does not explicitly refer back to the requirement of "inability to ambulate effectively", and other Listings within that section do. *See, e.g.*, Listing 1.04C.

Plaintiff asserts that the introduction does not apply to Listing 1.04A, while the Commissioner asserts that it does. Courts have read the provision both ways. *Compare, e.g., Isaacs v. Berryhill*, 2017 WL 1190382, at *3-4 (W.D. Ky.) (finding inability to ambulate not a criteria necessary to satisfy 1.04A) *with Miller v. Colvin*, 2014 WL 2208119, at *3 (W.D.N.C.) (finding inability to ambulate a necessary criteria to satisfy 1.04A).[3] The undersigned need not, however, delve into this disagreement because, regardless, Plaintiff has not satisfied his burden of showing a "substantial question" as to whether he meets Listing 1.04A, as is necessary to obtain remand.

---

3. As the Commissioner points out, two circuit courts have construed the ineffective ambulation requirement to apply to Listing 1.04 generally. *Leibig v. Barnhart*, 243 F. App'x 699, 702 (3d Cir. 2007); *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007). Neither court, however, performed any in-depth analysis of the statutory interpretation issue. *See Leibig*, 243 F. App'x at 702 (noting conclusorily that Listing 1.04A requires an inability to ambulate effectively); *Audler*, 501 F.3d at 448 (addressing Listing 1.04A and stating "[t]o demonstrate the required loss of function for a musculoskeletal impairment, [Plaintiff] must demonstrate either an 'inability to ambulate effectively on a sustained basis . . . , or the inability to perform fine and gross movements effectively on a sustained basis.'") (quoting § 1.00B2).

Here, even assuming *arguendo* Plaintiff's reading of the regulations is correct, remand is not required.[4] "The Sixth Circuit has declined to adopt a blanket rule that remand is required whenever an ALJ 'provides minimal reasoning at step three of the five-step inquiry.'" *Wischer v. Comm'r of Soc. Sec.*, 2015 WL 518658, at *12 (S.D. Ohio) (quoting *Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x 359, 365 (6th Cir. 2014)). The Sixth Circuit has found an ALJ's conclusory findings at Step Three to be harmless error where the plaintiff did not put forth sufficient evidence to demonstrate that his or her impairments met or medically equaled the severity of the listing. *See Smith–Johnson v. Comm'r of Soc. Sec.,* 579 F. App'x 426, 432 (6th Cir. 2014); *see also Forrest,* 591 F. App'x at 365 (citing *Reynolds,* 424 F. App'x at 416) (finding that an ALJ erred by providing no reasons to support his finding that a specific listing was not met, and holding that the error was not harmless because it was possible that the claimant had put forward sufficient evidence to meet the listing)); *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 642 (6th Cir. 2013) ("A substantial question about whether a claimant meets a listing requires more than what [Plaintiff] has put forth here, a mere toehold in the record on an essential element of the listing."). Thus, in instances where the ALJ does not properly evaluate a listing, the court must "determine whether the record evidence raises a substantial question as to [Plaintiff's] ability to satisfy each requirement of the listing." *Smith–Johnson,* 579 F. App'x. at 432-33. The claimant "must point to specific evidence that demonstrates he [or she] reasonably could meet or equal every requirement of the listing." *Id.* at 432. "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433. The same rationale logically applies to an allegedly incorrect evaluation of a Listing as it does to the failure to address a Listing.

---

4. The Commissioner addresses Listings 1.04A and 1.04B, however Plaintiff does not raise an assertion that he meets the criteria of 1.04B. As such, the undersigned only addresses 1.04A.

Listing 1.04A requires a showing of: "nerve root compression characterized by neuro-anatomic distribution of pain" *and* "limitation of motion of the spine" *and*, "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss" *and* "if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." Plaintiff has not pointed to evidence to raise a "substantial question" as to whether he meets this listing.[5] He does not point to a 12-month period of motor, sensory, or reflex loss.

In fact, in his argument to the Court, Plaintiff does not point to any specific evidence to show he meets the listing, but only argues the ALJ erred in his interpretation of the Listing. *See* Doc. 16, at 19-20.[6] Thus, even assuming Plaintiff is correct in his interpretation of the Listings,

---

5. Indeed, at the hearing before the ALJ, Plaintiff's representative seemed to acknowledge Plaintiff did not meet the listing:

> **REP:**  . . . . The other argument is that, *although he doesn't completely match the listing on the low back*, *he comes close* as of November 17, 2014 because we do have an MRI that shows nerve root encroachment and we do have a positive straight leg raise test, again, that's recent.
>
> And his testimony indicates that there's some dermatome involvement, although not – I mean, we're talking numbness, not pain now like *so, yes, it doesn't completely match the listing*, I think it's 1.04, but I don't – off the top of my head.
>
> **ALJ**: And my only concern with meeting Listing 1.04 is that there has to be an indication that he requires the use of two canes, a walker or two crutches for ambulation.
>
> **REP**: I think that's another part of 1.04.
>
> **ALJ:** That's actually the procured [sic] – it's part of Section 1.0, the beginning part of it.
>
> **REP:** Yes.
>
> **ALJ:** You're required to have that before we can even look at the portion of 1.04.
>
> **REP**: Okay. The part I'm talking about is the nerve root compression, the dermatome and straight leg raising. *But, nevertheless, I don't think it's an exact match*, but it's certainly indicative that there is a serious problem that has arisen recently. So those are our arguments, Your Honor.

(Tr. 79-80) (emphasis added).

6. The undersigned notes that the Commissioner makes this argument in her brief—that Plaintiff has not shown such evidence to satisfy the Listing. *See* Doc. 18, at 23. Plaintiff filed a Reply brief,

Plaintiff has not satisfied his burden at Step Three of pointing to evidence raising a "substantial question" as to whether he satisfies 1.04A. The undersigned therefore concludes that any error in this regard is harmless. *See Smith-Johnson*, 579 F. App'x at 432 ("A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he has satisfied a listing. Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing.").

***Consideration of Consultative Examiner***

Finally, Plaintiff argues the ALJ erred in his analysis of the opinion of consultative psychological examiner, Dr. Shamberg. Specifically, Plaintiff contends "[t]he ALJ fails to provide good reasons to not give controlling weight" to Dr. Shamberg's opinion. (Doc. 23, at 26).

First, an ALJ is not required to provide the same "good reasons" for discounting a one-time examining physician as she is for a treating physician. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("the SSA requires ALJs to give reasons for only *treating* sources"). Similarly, a consultative examiner's opinion is not entitled to the same controlling weight presumption as a treating physician. *Id.* The ALJ is, however, to weigh the opinion of agency examining physicians under the same factors as treating physicians, including the supportability and consistency of those opinions. *See* 20 C.F.R. § 404.1527(d). Thus, the question is not one of "good reasons", but rather whether the ALJ's decision in this regard is supported by substantial evidence. As discussed below, the undersigned concludes that it is.

The ALJ gave Dr. Shamberg's opinion "some weight". (Tr. 24)." *Id.* In so doing, she: 1) adopted Dr. Shamberg's conclusion regarding responding appropriately to supervisors, coworkers,

---

and does not address this argument, nor point to evidence to show he meets the Listing. *See* Doc. 19.

and workplace pressures; 2) discounted his opinion regarding Plaintiff's ability to remember and carry out job instructions, and maintain persistence and pace; and 3) discounted the GAF score assigned.

As to adopting the workplace pressures restriction, the ALJ explained that this "appear[ed] consistent with his treatment records that noted he appeared emotionally distraught when dealing with the significant situational stressors of his ex-wife's death." (Tr. 24). Although Plaintiff interprets this as Dr. Shamberg believing Plaintiff was showing "lingering effects of his ex-wife's death", the ALJ opinion cites a February 2014 treatment note from Dr. Kanney wherein he indicates Plaintiff was distraught. (Tr. 24) (citing Tr. 826). The ALJ later explained that "his reaction to his ex-wife's death does support that he could have some limitations in regard to responding to workplace changes such that he would perform better in an environment with no strict production demands or quotas." (Tr. 25). The ALJ reasonably considered, thus, how the treatment records suggested Plaintiff would respond to stress in the workplace.

As to the portions of Dr. Shamberg's opinion the ALJ rejected, she explained they were not consistent with Dr. Shamberg's observations of Plaintiff, nor with other treatment notes in the record. The ALJ found Dr. Shamberg's opinion regarding job instructions, persistence and pace was not supported by "his own observations". (Tr. 24) (citing Tr. 526-27). Indeed, in Dr. Shamberg's evaluation, he found Plaintiff's "thought processes as reflected in speech were always logical, coherent, and goal directed", he "did not show any signs of anger, impatience, and/or irritability", and noted Plaintiff was "polite, deferential, and cooperative, in a manner appropriate for the office setting." (Tr. 526). In terms of cognitive functioning, Dr. Shamberg noted Plaintiff "slowly but correctly completed the Serial 3, and later the Serial 7 tasks, making two errors on the later one, but finishing it." (Tr. 527).

33

Second, the ALJ cited treatment records spanning May 2012 through April 2014 that "noted continually [Plaintiff] was alert and oriented with a normal memory function, good concentration and clear articulation." (Tr. 24) (citing Tr. 387, 392, 397, 403, 412, 419-20, 426, 430-31, 438, 446, 837, 857). These consistent longitudinal notes in the treatment record were a valid reason to discount Dr. Shamberg's opinion that Plaintiff would have more difficulty than the ALJ found in carrying out job instructions and keeping up the pace and persistence.

Citing the same treatment records, the ALJ gave "little weight" to the GAF score of 45 (indicating serious symptoms) assigned by Dr. Shamberg. She also noted such a score was "not consistent with his presentation at the examination . . . since the claimant manifested no signs of anxiety, his thought processes were always logical, coherent and goal-directed, he was polite and cooperative with no bizarre behavior habits or signs of anger, impatience and/or irritability, which are findings that do not appear to align with the GAF score." (Tr. 25) (citing Tr. 526-27).[7] Plaintiff objects to the ALJ's finding the GAF inconsistent with Plaintiff's "presentation where the score was assessed because supposedly there he 'manifested no signs of anxiety.'" (Doc. 16, at 23). Plaintiff points out that Dr. Shamberg noted he "appear[ed] somewhat nervous and somewhat suspicious with a very flat and depressed appearance." (Tr. 526). The finding Plaintiff objects to, however, is not one made originally by the ALJ, but by Dr. Shamberg himself. *See* Tr. 527 (noting, under the heading "Anxiety", that "[m]anifest signs of anxiety such as crying, fidgeting, and/or

---

7. Plaintiff also objects to the ALJ's consideration of his failure to seek mental health treatment, citing a Seventh Circuit standard that an ALJ must inquire of the claimant the reasons for failure to seek treatment. *See* Doc. 16, at 21. In the Sixth Circuit, although failure to seek medical care "should not be a determinative factor" when the claimant has a mental impairment, *Blankenship v. Bowen*, 874 F. 2d 116, 1124 (6th Cir. 1989), in the present case, "there is no evidence suggesting that [Plaintiff's] mental condition somehow hindered him from seeking examination or treatment", *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004). The ALJ's consideration of Plaintiff's lack of mental health treatment was not a determinative factor in his decision, but rather simply one factor he considered. As such, this was not reversible error.

trembling were not observed here"). Thus, although Dr. Shamberg noted Plaintiff was nervous in his observations, he also noted Plaintiff did not manifest any physical signs of anxiety. The ALJ did not err in relying on these findings. It is up to the ALJ, not the reviewing court, to resolve conflicts in the evidence; the court's review is limited to determining whether substantial evidence supports the ALJ's conclusion. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

Finally, the ALJ did not find Plaintiff capable of a full range of mental activities. Rather, she accounted for those mental restrictions she found credible in her ultimate RFC determination and limited Plaintiff to "understanding, remembering and carrying out simple, routine and repetitive tasks where the pace of productivity is not dictated by an external source over which he has no control and there is no interaction with the general public with only occasional, superficial interaction with co-workers and supervisors." (Tr. 25). The undersigned therefore finds the ALJ's analysis of Dr. Shamberg's opinion supported by substantial evidence.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI is supported by substantial evidence, and therefore recommends the Court affirm the Commissioner's decision.


 s/James R. Knepp II
United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time

WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).